**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARIE PLUMER,                                      C.A. No.   1:23-cv-88

                          Plaintiff,               No.

          v.                                       **JURY TRIAL DEMANDED**

VENANGO COUNTY, SAM BREENE, in
his individual capacity, MIKE DULANEY, in
his individual capacity, and ALBERT
ABRAMOVIC, in his individual capacity,

                          Defendants.

## COMPLAINT

COMES NOW the PLAINTIFF, Marie Plumer, by her attorneys, Stember Cohn &

Davidson-Welling, LLC, who in support of her COMPLAINT, respectfully avers as follows:

## I.  INTRODUCTION

In 2007, Plaintiff Marie Plumer was hired to work in the Venango County Human

Services Department ("VCHS").  In 2020, she became the Human Services Administrator, a

position she held until September 26, 2022, when Venango County terminated her for protected

complaints of wrongdoing in violation of the Pennsylvania Whistleblower Law, 43 P.S. § 1421.

*et. seq.*, and the First Amendment of the United States Constitution.

## II.  JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiff's federal law claim under 28 U.S.C. § 1331 and

supplemental jurisdiction over her state claim under 28 U.S.C. § 1367(a). Venue is proper in this

Court under 28 U.S.C. § 1391.

### III.  PARTIES

1.     Plaintiff, Marie Plumer ("Plaintiff" or "Plumer"), is an adult woman who resides in Venango County, Pennsylvania.

2.     Defendant, Venango County ("Defendant" or "the County"), is a county in the Commonwealth of Pennsylvania.

3.     Defendant Sam Breene is a Venango County Commissioner.

4.     Defendant Mike Dulaney is a Venango County Commissioner.

5.     Defendant Albert Abramovic is a Venango County Commissioner.

### IV.  FACTS

6.     In October 2007, Plumer began working for VCHS.

7.     Over 15 years, she earned many promotions and received positive performance reviews.

8.     In April 2020, Plumer was promoted to Human Service Administrator ("HSA").

9.     As HSA, Plumer led VCHS and worked closely with the County's Human Resources Department ("HR"), and with the County's three elected Commissioners, Sam Breene ("Breene"), Mike Dulaney ("Dulaney"), and Albert "Chip" Abramovich ("Abramovich").

10.    Plumer's duties included the oversight of six VCHS departments and over 160 employees; and she was responsible for coordinating and implementing human service programs for County residents, many of which were funded through state and federal programs and grants.

11.    Among these VCHS programs was the "Bridge Housing Program" ("BHP"), whose mission was to provide housing to the homeless.

12.     At all relevant times, the BHP was funded partially or completely by federal and state grants, including from the federal Community Services Block Grant ("CSBG") and the Commonwealth of Pennsylvania's Human Services Development Fund ("HSDF").

13.     In 2015 or 2016, VCHS purchased a building at 1269 Liberty Avenue ("Liberty Building") in Franklin, PA, using state and federal funds, and then it transferred the building to Emmaus Haven, a non-profit organization, to run a shelter.  VCHS also contributed approximately $50,000 towards renovations of the Liberty Building.

14.     As part of an agreement to run the BHP in conjunction with the County Housing Department, VCHS paid approximately $1,800 per month to Emmaus Haven for use of the Liberty Building.

15.     By 2016, Emmaus Haven began offering BHP services to County residents out of the Liberty Building.

16.     The Liberty Building housed up to six BHP clients.

17.     In early 2022, VCHS employees, including Plumer, learned that the County would receive settlement funds later in the year in connection with the County's participation in an opioid-crisis related litigation.

18.     Under the litigation's settlement terms, the County was to put the funding towards combatting and mitigating harm to local residents due to the opioid crisis.

19.     Upon learning this information, Plumer repeatedly requested throughout 2022 that the Commissioners form a steering committee so that VCHS could assist in allocating the settlement funds.

20.     The Commissioners ignored every one of Plumer's requests that they form a committee.

21.     Shortly after learning the County would receive settlement funding, the Commissioners began to voice concerns about the BHP's "undesirable" clientele living in the center of Franklin's business district.

22.     The Commissioners proposed relocating BHP housing further away from central Franklin by July 2022.

23.     The Commissioners' proposal upset many VCHS employees, including Plumer, who were concerned about damaging the relationship with Emmaus Haven.

24.     Nonetheless, Plumer suggested several alternative locations.

25.     These alternatives included using a building already owned by VCHS, on Grandview Road ("Grandview Building"), or alternatively, purchasing or renting a privately owned building, such as the Idlewood Building, which was in the process of being converted into efficiency apartments suitable for the BHP.  Multiple properties were toured to determine the best option.

26.     The Commissioners rejected the options proposed by VCHS, providing little or no explanation.

27.     For example, Abramovic cancelled the appraisal of one building and stopped the sales negotiations because he was "not happy with the attitude of the seller."

28.     Instead, Abramovic suggested that VCHS lease a building on Grant Street ("Grant Building").

29.     The Grant Building was owned by Abramovic's close friend, Chris Taylor ("Taylor").

30.     The Grant Building was smaller than the Liberty Building with smaller and fewer private apartments. and it could only house one or two additional BHP clients.

31.     Leasing the Grant Building would cost VCHS $4,200 per month for five years, with rental increases in subsequent years—more than double the cost of leasing the Liberty Building.

32.     On or about May or June 2022, Taylor revealed to Plumer that Abramovic proposed VCHS relocate the BHP to the Grant Building while the two were drinking around a campfire earlier in the year.

33.     In May 2022, Plumer called a local realtor to appraise the Grant Building's value and cost per square foot.

34.     While calculating the value and cost of the Grant Building, the realtor informed Plumer that "whoever proposed this building was robbing the County."

35.     Plumer relayed the realtor's comments to Abramovic and told him the VCHS housing budget could not cover or justify such an expense.

36.     Abramovic responded that the Grant Building proposal was a "done deal," and that Plumer should find the money and not make him "look like an asshole" to his friend.

37.     Weeks later, on June 10, 2022, Abramovic texted Plumer to ask if the opioid settlement money could be spent on the BHP.

38.     Plumer told Abramovic that further discussion should be had and, in follow up, reiterated that a committee regarding the settlement fund should be formed by the Commissioners.

39.     None of the Commissioners ever mentioned or proposed any other use of the opioid settlement funds to Plumer, who oversaw nearly every department and program in the County that might use them.

40.     In late June or early July 2022, Plumer began working with County Solicitor Rich Winkler ("Winkler") to further research Abramovich's BHP proposal.

41.     Plumer told Winkler of her concerns about the Grant Building's cost, the Commissioners' rejection of cheaper alternatives like the Grandview Building (which VCHS already owned), the damage it would do to the relationship with Emmaus Haven, and Abramovic's improper motivations.

42.     Around this time, Plumer expressed these concerns to HR Director Justin Wolfe ("Wolfe") and other HR personnel.

43.     Afterwards, Abramovic became increasingly hostile, started scrutinizing Plumer, and he began to push harder to transfer the BHP to the Grant Building.

44.     On one occasion, Abramovic texted Plumer that "as a Commissioner I strongly feel my opinions mean absolutely nothing. And I am avoided in the discussion instead of being part of the solution which I have to approve. It's been going on for months and it's really getting bothersome."

45.     Before Plumer raised her concerns about the BHP, Abramovic had acknowledged that staffing issues were due to low compensation and increased workloads of remaining VCHS staff, over which Plumer had little control.

46.     However, after Plumer raised her concerns, Abramovic started to blame Plumer for the County's poor staff retention and VCHS's inability to replace employees.

47.     For example, after Plumer had forwarded him a resignation letter from VCHS staff and thanked Abramovic for reading it, he accused her of being passive aggressive.

48.     Moreover, in late July 2022, Abramovic became upset and blamed Plumer for Mandy Sheffer's ("Sheffer") rejection of a VCHS job offer as follows:

- Plumer offered a position in VCHS's Children and Youth Services ("CYS") division to Sheffer at the wage authorized by HR.
- Sheffer wrote to Plumer that she was unwilling to accept the position at the compensation offered.
- Plumer informed the Commissioners that Sheffer had rejected the job offer.
- Abramovic became upset that Plumer had "failed" to hire Sheffer.
- Plumer attempted to call Abramovic, who refused to pick up her calls.
- Plumer then texted him and explained that Sheffer's rejection was "the same old story" regarding low pay, and stated she did not know why HR would not approve a higher rate.
- Later on, however, Sheffer changed her mind and accepted the position at the HR-approved rate that Plumer initially offered.
- Abramovic again became irate and blamed Plumer for the staffing issues in VCHS.

49.     On August 24, 2022, at Abramovic's insistence, Plumer toured the Grant Building with Taylor.

50.     On September 10, 2022, Plumer heard rumors—not for the first time—that Commissioners were drinking with VCHS employees.

51.     Plumer had previously discussed this issue with the Commissioners on several occasions, but each time, the Commissioners told her not to worry about it.

52.     However, on September 18, 2022, Plumer received reports from her subordinate, Jake McVay, that one of his female reports went out for drinks with Abramovic, and then quit shortly thereafter.

53.     Around this time, Plumer began to hear rumors that HR had offered her HSA position to someone else.

54.     On September 21, 2022, Plumer met with Wolfe and HR Deputies Shannon Mahoney and Amie Wessell ("Wessell") to discuss a number of her concerns, including a request to have an HR member assigned to VCHS headquarters for the purposes of improving communications between VCHS and HR.

55.     During the meeting, Wolfe took Plumer's proposal as an attack on the HR department, misconstruing her proposal to mean that Plumer thought HR was not doing its job.

56.     Plumer also discussed her frustrations about the unresponsiveness of the Commissioners regarding her requests that they form a steering committee regarding the opioid settlement funds.

57.     Plumer alerted HR to the report she received about a female report who had quit shortly after she was drinking with Abramovic, and of the Commissioners drinking with coworkers more generally.

58.     Finally, Plumer raised concerns that the Commissioners were going to fire her.

59.     Wolfe did not indicate that Plumer had any negative performance citations or reviews, or that he was aware of any outstanding concerns.

60.     On September 22, 2022, Plumer spoke with Commissioners Breene and Dulaney about improving communications between VCHS and the Commissioners. All agreed to hold more regular meetings together, and they gave no indication that Plumer's job was in jeopardy.

61.     On September 26, 2022, without providing advance notice, Wolfe and County Solicitor Stephanie Fera ("Fera") came to Plumer's office while she was conducting a Zoom meeting.

62.     Fera told Plumer to shut off her computer and announced that she was conducting a Loudermill hearing.

63.     Fera stated that the Commissioners had lost confidence in Plumer, she would be terminated, and "nothing would change their minds."

64.     Fera went on to describe a litany of unfounded complaints that the Commissioners allegedly had about Plumer.

65.     At this point in the <u>Loudermill</u> hearing, Winkler had called Plumer's phone at least three times.

66.     On information and belief, Winkler was calling to participate and offer information in Plumer's defense at the hearing.

67.     Plumer asked Fera if she could answer Winkler's calls.

68.     Fera denied her request to pick up the phone for Winkler and stated that Plumer "no longer had any business" with him.

69.     Fera then resumed describing the Commissioners' complaints against Plumer.

70.     After Fera's allegations concluded, Plumer pleaded to present information in her defense.

71.     Fera declined and reiterated that nothing Plumer said would change the Commissioners' minds.

72.     Fera and Wolfe then stated that Plumer could either resign immediately or be terminated.

73.     After discharging Plumer, the Commissioners appointed HR Deputy Wessell to act as interim Human Services Administrator.

74.     Abramovic's plans for VCHS to rent Taylor's building for the BHP were quickly approved and carried out in October 2022, ending Emmaus Haven's involvement with the program.

75.     On information and belief, the Commissioners have not formed any committee to determine how opioid settlement funds will be used.

76.     After Plumer's termination, multiple associate providers of the County told Plumer that they would hire her if not for fear of reprisal by the Commissioners.

77.     Following Plumer's termination, the County proceeded to lease the Grant Building.

78.     When the County acquired the Grant Building, it was not zoned for the use intended by Commissioners.

## V.  CAUSES OF ACTION

### COUNT I
**42 U.S.C. § 1983 (First Amendment Retaliation)**
**(Venango County; Defendants Breene, Dulaney, and Abramovic,**
**in their individual capacity)**

79.     Plumer incorporates all of the above paragraphs as though fully set forth herein.

80.     Plumer, acting in her individual capacity as a citizen, exercised her right of free speech and engaged in constitutionally protected conduct when she requested that the Commissioners establish a committee for the allocation of settlement funds from the opioid settlement to be disbursed by Commonwealth of Pennsylvania.

81.     Plumer, acting in her individual capacity as citizen, exercised her right of free speech and engaged in constitutionally protected conduct when she investigated the cost of acquiring the Grant Building and reported the results of her investigation—that the acquisition was wasteful and corruptly motivated—to Abramovic, Winkler, and Wolfe.

82.     Plumer, acting in her individual capacity as a citizen, exercised her right of free speech and engaged in constitutionally protected conduct when she raised concerns with the Commissioners and Wolfe about Commissioners' drinking with VCHS staff and the abrupt resignation of a VCHS employee after she went drinking with Commissioner Abramovic.

83.     Defendants, acting under color of state law and intending to deprive Plumer of her employment, retaliated against Plumer by terminating her because she exercised her right of speech under the First Amendment.

84.     Defendants' actions deprived Plumer of her rights in violation of 42 U.S.C. § 1983 and the First Amendment and the Fourteenth Amendments of the United States Constitution.

85.     Defendants' actions are the type of activity that would keep a person of ordinary firmness from exercising her First Amendment rights.

86.     Defendants knew that terminating Plumer violated her constitutional rights.

87.     Defendants' conduct constitutes misuse of power possessed solely by virtue of state law and was made possible only because Defendants are clothed with the authority of state law.

88.     Defendants' conduct was outrageous, extremely offensive, intentional, and discriminatory toward Plumer; and it was performed with malicious, reckless indifference, and/or wanton disregard of Plumer's civil rights.

89.     As a direct and proximate result of the County's actions, Plumer has suffered, and continues to suffer, economic and non-economic damages, including lost wages and benefits, damage to her reputation, pain, suffering, embarrassment, and humiliation.

## COUNT II
### 43 P.S. § 1423 (Retaliation under the Pennsylvania Whistleblower Law)
### (Venango County)

90.     Plumer incorporates all of the above paragraphs as though fully set forth herein.

91.     Plumer was an employee of Defendant Venango County.

92.     Plumer complained about, resisted, and reported the Commissioners' wasteful proposal concerning the Grant Building, the management and allocation of opioid settlement funds, and fraternization with County employees.

11

93.     The County violated the Pennsylvania Whistleblower Law by retaliating against Plumer and terminating her employment in response to her good-faith complaints and reports of wrongdoing, misconduct, and waste.

94.     The County's explanations for Plumer's discharge were meritless and a pretext for her termination.

95.     As a direct and proximate result of the County's actions, Plumer has suffered, and continues to suffer, economic and non-economic damages, including lost wages and benefits, damage to her reputation, pain, suffering, embarrassment, and humiliation.

## VI.  PRAYER FOR RELIEF

**WHEREFORE**, Plumer prays that this Court will:

a)      Enter judgment against the County on Counts I and II;

b)      Declare the County violated Plumer's right to be free from retaliation under 43 P.S. § 1423;

c)      Declare the County violated Plumer's First Amendment rights under 42 U.S.C. § 1983;

d)      Permanently enjoin Defendants from discriminating against Plumer for engaging in First Amendment activities and conduct protected by the Pennsylvania Whistleblower law;

e)      Reinstate Plumer to the position she occupied when she was terminated;

f)      Make Plumer whole and award her compensatory damages including, but not limited to, amounts for pain, suffering, embarrassment, humiliation, losses to reputation, lost earnings and benefits, and lost future earnings potential;

g)      Award Plumer punitive damages against the individual Defendants;

h)      Award Plumer attorneys' fees and costs pursuant to 43 P.S. § 1425 and 42 U.S.C. § 1988, and any other applicable law;

i)      Award Plumer pre- and post-judgment interest as provided by law; and

j)      Award Plumer such other relief, at law or in equity, as this Court deems proper.

## DEMAND FOR JURY TRIAL

Plumer demands a jury trial on all claims so triable.

Respectfully submitted,

Dated: March 24, 2023

/s/ Jonathan K. Cohn
Jonathan K. Cohn
PA I.D. No. 92755
jcohn@stembercohn.com
Maureen Davidson-Welling
mdw@stembercohn.com
PA I.D. No. 206751
**STEMBER COHN &**
    **DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.: (412) 338-1445
F.: (412) 338-1446

*Attorneys for Plaintiff*